MORRISON (PHILADELPHIA & R. R. CO. v.). See Case No. 11,089.

MORRISON (STATE NAT. BANK OF MINNEAPOLIS v.). See Case No. 13,325.

---

## Case No. 9,849.

MORRISON et al. v. The UNICORN.

[5 Hughes, 79; 3 Quart. Law J. 333.]

District Court, D. South Carolina. July Term, 1858.

WORDS AND PHRASES—LOSS—AVERAGE—SALVAGE.

The construction and legal effect of the terms, loss, average, and salvage in maritime contracts.

[This was a libel by R. Morrison & Co. against the cargo of the brig Unicorn.]

MAGRATH, District Judge. The argument in this case relates exclusively to the construction of certain words in a maritime contract, between the libellants and the master of the brig Unicorn, in the port of Havana. By the written obligation, the sum loaned was £1,622 17s., 8d., sterling, at a premium of twenty-five per centum; its payment secured by the block, the cargo and freight, of the brig. She sailed from Havana to a port of

discharge in the kingdom of Great Britain, calling at Queenstown for orders; put into the port of Charleston from stress of weather; was surveyed, ordered to be repaired, and then sold. The validity of the bond is conceded. The holders have libelled the cargo, which has been sold under a decree; and the proceeds of that sale, except so much as has been paid at the instance and with the consent of the proctors, the costs and other charges, now remain in the registry subject to the order of the court. That part of the contract submitted for construction, is the following clause: "In case of loss of said brig Unicorn, such an average as by custom shall have become due on the salvage." The amount in the registry is not sufficient to pay the principal and maritime interest due to the libellants. And it is now contended that the libellants are not entitled to receive the whole amount, but only a proportion; to be determined by the ratio which the loan (whether with or without maritime interest is not stated) bore to the value of the ship, cargo and freight, at the time of her departure from Havana. The argument is made to rest principally upon the opinion expressed in 2 Arn. Ins. p. 1203, in which he refers with approbation to the argument of Valin and the article 331 of the Code de Commercio, liv. 2, tit. 9.

There cannot be much doubt of what was the rule of the general maritime law. In the 18th article of the Ordonnance de la Marine, it is laid down: "S'il y a contrats a la grosse et assurance sur au meme changement le donneur sera preferé aux assureurs sur les effets sauvés du naufrage pour son capital seulement." 2 Valin, Comm. 20. The lender in such a maritime contract would recover in preference to the insurer, the principal sum; but not the maritime interest. And this rule is supported by Emerigon, who assigns as the motive of the preference, that the lender contributes directly and physically to the existence of the effects put at risk; whereas the insurer is a simple guarantor who inspires courage, it may be, but does not procure or furnish the thing itself. The lender, he adds, acquires, in the commencement, a lien on the thing put at risk; and it can not be annulled by the alienation, which an abandonment subsequently works towards the insurer. Emerig. Ins. c. 17, § 12. He is supported in this opinion by Pothier; but the rule is questioned by Valin. It is not necessary to enter upon that discussion which engaged these distinguished men. It was not directed, as this must be, to determine what is the law; a much wider field was opened in the consideration of what it should be. Valin tells us in his correspondence with Emerigon, that the latter submitted the question to the admiralty, and it considered his argument consistent with common rights; but that the maritime law followed the response of the Roman emperor: "Ego quidem mundi dominus, sed lex maris." 2 Comm. 30. Boulay Paty (3 tom.,

p. 229) says the admiralty of Marseilles was influenced by the argument of Valin; and the Code de Commerce adopted his opinion in the article which provides in such cases a division of the property saved, between the lender and assurer, in proportion to their several interests. The interest of the lender being the principal sum without the maritime interest; and that of the assurer, the amount which he has agreed to insure. In a question of maritime law, the Code de Commerce is regarded as a collection of regulations, municipal in their operation: but the Ordonnance de la Marine is described by Chief Justice Marshall, as compiled with great care by the first civilians of the nation, and with a view not only to all the ancient codes which are extant, but also to the customs and laws of all the maritime states of Europe. Selden v. Hendrickson [Case No. 12,639].

In this case I cannot discover the authority upon which, in the United States, that construction can be supported which maintains a division of the property saved, where it is insufficient to repay the lender the sum advanced. The terms in which the rule is recommended by Mr. Arnold plainly show that he did not understand it as adopted in Great Britain; and I think it equally clear that it never has been adopted in the United States. In [The Virgin v. Vyfhins] 8 Pet. [33 U. S.] 553, Judge Story, when he pronounced for the validity of the bond, added, as the legal consequence, that it must be upheld to the extent of the property pledged for its payment. The 18th admiralty rule provides that, in all suits on bottomry bonds, they shall be in rem only; unless the master has, without authority, given the bond, or by fraud or misconduct avoided it, or subtracted the property, or unless the owner, by his misconduct or wrong, has lost or subtracted the property; in which case the suit may be in personam. And this rule is declaratory of the rule of the general maritime law, as enforced in the United States. The nature of, and the obligation arising from, these bottomry contracts are well understood. In The Ann C. Pratt [Case No. 409], Judge Curtis says: "This is a contract of a peculiar character, distinguishable by very marked characteristics from an ordinary loan," and cites the language of Pothier that "it differs from all other contracts and forms a particular species by itself;" and that, also, of Boulay Paty, that "it is a contract having a specific name and character to itself." In Pope v. Nickerson [Id. 11,274], and in The Draco [Id. 4,057], Judge Story has thoroughly examined these contracts, and in the latter case, defines it, as a "contract for the loan of money on the bottom of a ship, at an extraordinary interest, upon maritime risk to be borne by the lender." And this definition is in accordance with Simonds v. Atlantic Ins. Co., 1 Pet [26 U. S.] 436, 3 Kent, Comm. 362. This contract is received as of great antiquity, varying in terms according to the laws or customs of the

places in which it is used, but having two great tests; the exclusion of the personal liability of the owner and the assumption by the lender of the risks of the voyage. The total exemption of the owner, except in the cases mentioned in the 18th admiralty rule, is illustrated in The Nostra Señora del Carmine, 29 Eng. Law & Eq. 572, where the cargo having been taken out on bail and the fund proving deficient because of certain claims which had been interposed, the court refused an application to cause the owners of the cargo to pay in a further sum, the amount of the bail being assumed as the value of the cargo.

If the rule of an exemption of personal liability be so positively enforced, it is not obvious why the protection of the lender should not be equally considered, so far as it can be accomplished, by the application of the property to the debt, which it has been pledged to secure. These contracts are not forbidden; and although, as we shall presently see, subjected by Valin to severe criticism, are, nevertheless, with the guards placed around them, considered as important agencies in the advancement of commerce. Their operations may be controlled by the parties in the introduction of stipulations which modify, or, perhaps, wholly change them. In this case, then, if the parties to this contract have introduced conditions which qualify or limit the rights they otherwise would have had, they must submit to that consequence; every contract, as a general rule, is a law for the parties to it. By this contract, the brig Unicorn, freight and cargo, are assigned over for the security of the loan taken, by the master, and shall be delivered to no other use or purpose whatever, until payment of the bond be first made with the premium which may be due thereon, the time of payment is specified, and then follows the condition, in case of loss of the said brig Unicorn, such an average as by custom shall become due on the salvage.

Before I proceed, however, to the consideration of that part of this clause, which has been argued, there is another which requires also consideration. What is to be understood by the words "in case of the loss of said brig?" The construction of the other parts of the sentence succeeds that, which is the proper understanding of these words. The case of The Elephanta, 9 Eng. Law & Eq. 553, is a leading case upon this point. In that case the bond provided that if the vessel and her cargo should be lost, miscarried, or cast away, the sum loaned and the interest should not be recovered. By stress of weather the ship was forced into Algoa Bay; was surveyed, and found to require considerable repairs. For these repairs advertisements were made; but the attempt was unsuccessful, and the vessel was abandoned for a total loss. Part of the cargo was sold, and the proceeds remitted to London, and part was re-shipped and reached England. Dr. Lushington, after commenting upon the little aid he had received from adjudicated cases, proceeds to examine the terms, lost and miscarry; cast away, of course, had no application to the case. The explanation of "loss" he derives chiefly from the case of Thomson v. Royal Exchange Assur. Co. 1 Maule & S. 30, in which Lord Ellenborough held, that while the ship existed in specie, she was not lost; and although the expense of repairing was ruinous, yet she was not lost within the meaning of the bond, if existing in specie and capable of receiving repair. Accordingly the bottomry holder was held to be entitled to the goods reshipped to England and the proceeds of those sold at Algoa Bay. In Joyce v. Williamson, referred to in Park, Ins. 463 (reported in 26 E. C. L. 164), the bottomry bond contained a clause, that if the vessel should be taken by the enemy, cast away, miscarry or be lost, before her safe arrival at New York, it should be void. The vessel was captured by a privateer, retaken, and carried into Halifax, where part of the cargo was sold for salvage and repairs, and she afterwards arrived at New York with the remainder of her cargo.

The vessel was worth the amount of the bond, but not that amount with the repairs added to it. Lord Mansfield held the taking, not a loss intended by the bond; and the lender not liable for average or salvage. In the Catherine, 1 Eng. Law & Eq. 679, the same rule is laid down; and the circumstances of the case are so similar to those in the case before me, that its decision would be sufficient authority to guide me to a conclusion. In Pope v. Nickerson [Case No. 11,274], the rule is laid down with great clearness. "The bottomry holders," says Judge Story, "undertake the risk of the voyage and that the schooner shall be able to perform it, notwithstanding the enumerated perils which in the present case were fire, enemies, pirates, and other dangers and casualties of the sea and rivers. But they do not undertake that the vessel shall be able to perform the voyage without any repairs, and without any retardation: but only that the dangers and casualties of the sea and rivers, and the other perils shall not of themselves defeat the voyage. They are to be paid their money unless the voyage is defeated by such dangers and casualties, or other perils, and these alone. The case is not like that of an insurer, where the underwriters are liable for a particular loss, or for a total loss, either in fact or in a technical sense. In cases of bottomry there can be no such thing as an abandonment by which a loss not strictly total can be turned into a technical total loss." In Simonds v. Hodgson, 3 Barn. & Adol. 51, 23 E. C. L. 32, it was held that the bond might provide for the arrival of the vessel to any port, if she was unable to reach the port of final destination.

In the argument here, the case was rested upon a ground which would be applicable to an insurer. But the claim made is that of an owner; and there is no proof of any insurance. If there had been, no proof is before

me of abandonment and acceptance. The argument of Valin is exclusively applicable to an insurer, and does not seem to have been considered by him as applicable to the case of the borrower. Recurring, then, to the construction of the "loss" in this case, it will be seen that the loan was made in Havana, in consequence of the damage which the brig had suffered. She was repaired, sailed from Havana, again experienced stress of weather, and came into the port of Charleston, where she was surveyed, and certain repairs recommended. She was not repaired; the estimates are said to have been too high. A sale was recommended in consequence of this; and it was made. I will not say how far these circumstances, as against an insurer, may be sufficient to make this constructively a total loss; but they do not constitute certainly a loss within the meaning of the bond. Pope v. Nickerson [supra]; 9 Eng. Law & Eq. 553. And I cannot find a better introduction to the reasons which support this conclusion, than in the language of Dr. Lushington: "If (says he) I should hold that the bottomry holder cannot recover under the existing circumstances, I apprehend that it must follow that no suit can be successfully maintained upon a bottomry bond where the ship was disabled from prosecuting her voyage; or the owners had a right and chose to abandon her; though the whole cargo may have been transhipped and brought in safety to the port of destination." 9 Eng. Law & Eq. 555.

The lender, in this case, had for his security an assignment of the brig, cargo and freight. If there is to be an apportionment as contended for, by the terms of the bond, it is confined to the loss of the brig. That a loss of the vessel, is not a loss of the cargo, so far as the security to the lender is concerned, is seen in The Elephanta. Here the vessel has been sold, and the proceeds are in the hands of the borrower or his agents. It is true that it is said, these proceeds have been applied to the payment of expenses. But I do not know anything of these expenses, and must hold them, therefore, to be such as affect the borrower. The cargo is not lost, or damaged, although the voyage is broken up. And the voyage is broken up, not because the cargo may not be transhipped, nor because the vessel may not be repaired; but because it is not profitable to the owner to do the one or the other. Can this, in any just sense, be termed "a loss?" If so, is it a loss from any of the perils or casualties which the lender in the bond consented to undertake? When the lender undertakes the risk of the voyage or the perils of the sea, it is a misapprehension to suppose that he does so for the benefit of the borrower. He is an insurer, not for the borrower, but for himself, to the extent of his loan. In fact, the borrower, to the extent of the loan, has no insurable interest; so perfect is the transfer, to the extent of the loan, that the lender may insure, but not the borrower. The personal liability of the owner is exclud-

ed, and the pledge of the thing, vessel or cargo, or both, substituted. If it is lost, the debt is not paid. But its arrival is not, if we speak with precision, the condition upon which the debt is to be paid; although it is a risk which, if it occurs, will defeat the payment. In contracts not of a maritime character, the lender may also bind himself to look to a certain security, and forego his personal action against his debtor; and if the security fails or is insufficient, his debt is lost, because he has no remedy.

In the same manner in these contracts, a loss of the thing pledged is a loss of the debt, because it is a loss of that to which the creditor agreed to look for payment. But this "loss" is the destruction of the property pledged, or its damage to a degree inconsistent with reparation. It is a loss, in fact, not by construction; and that loss occurring from the perils or casualties referred to in the bond. The obligation of this contract is as sacred as that of any other, and the general rule applies to this, that neither party can modify the terms or affect the rights of the other party, unless by consent. By this rule, as we have seen, Emerigon is guided in the denial of the right of the insurer to participate with the lender, because the abandonment by the insured, if it gives the insurer a share with the lender, is a variation of the contract, and affects the rights of the lender by circumstances occurring after the contract is executed, and for which no provision is made in the contract itself.

But open as is the argument for a participation in these proceeds, to this objection now stated; and which is an objection applicable to all contracts; yet perhaps to none would it be more productive of injury than the particular contract now before me. It begins by affirming a power in the borrower to deny the lender the benefit of his security, because it was constructively lost; although it actually existed in specie. This constructive loss results from the wishes and actions of the borrower, or his agents, and from it would arise benefit to the borrower and damage to the lender. He who before a constructive loss, was postponed to the lender, after he had made that loss, would participate with him. He who before that loss was entitled to the whole. Such a rule would involve a temptation to error, which in too many cases would be most urgent. In this case I have not any evidence, which suggests a suspicion of mala fides in the sale of the vessel; nor have I any evidence that its sale was necessary.

The repairs for which the bottomry bond was executed, had only been made within a recent period. The vessel had encountered heavy weather, but she was not disabled, and had not become unseaworthy. It may be true that the estimates for the repairs, which had been recommended, were high, and that the owners, if present, would have done precisely what the master did do. But, if so, I would

have to ask, with Judge Story, upon what grounds is the bottomry not to be paid? Shall it be held that in addition to all other perils assumed by the lender, that of the convenience or profit of the borrower shall also be assumed? "It was a duty (says Judge Story) which the owners owed the bottomry holders, if the schooner could have been repaired so as to perform the voyage, to have made the repairs." 'Pope v. Nickerson [supra]. I can only regard the sale of this vessel as an act terminating the voyage, dispensing with the time and place mentioned in it for its payment, and entitling the lender at once to proceed to recover the sum loaned. The Draco [Case No. 4,057]. But assuming it to be otherwise and that the vessel was in fact lost, the argument that the lender must divide with the borrower seems to me to be wholly untenable. If it is to be so in case of loss, by the terms of the bond it must be confined to the vessel. That sale was made by the master, and the proceeds are held by the agents of the owners. It has already been seen that even where the cargo was mentioned in the bond, and the ship was sold, the cargo was adjudged to the lender. The principle laid down by Emerigon, that "the borrower can claim nothing from the effects saved, until the lender be satisfied," and that "the creditor never comes into apportionment with his debtor on the thing which is the pledge for the payment of the debt," is of obvious force and universal application; and if any case has been decided in Great Britain or in the United States, which can be considered as sustaining the principle contended for in this case, I have not seen it. The right of an insurer to participate has been maintained with great zeal; but they who denied this right of the insurer, did so upon the ground that he represented only the rights of the borrower; and they who maintained his right, denied that he should be considered as representing the borrower, but insisted that he should be regarded to the extent of his insurance as having contributed to the enterprise. Indeed, the argument of Valin is addressed to a consideration of the superior claim of the insurer over the bottomry creditor as an efficient and indispensable instrument in developing the extension of commerce; and his argument in part is specially rested on the ground that the increase of maritime loans with the heavy rates of interest attached to them, would extinguish it. This argument, however, is wholly inapplicable to the case of the borrower; and I do not know that in the objection which he makes to a bottomry contract he is at all supported.

In adopting the conclusion, that in this case, there has been no loss within the meaning of the bond, I might omit all reference to the other part of the bond to which the argument was specially addressed. Perhaps, however, it is well that I should express my opinion of the proper construction. "Aver-age," in this connection, means proportion; "salvage" here signifies the thing saved. The average of the salvage is the share or proportion of the property saved. Such an average as by custom shall be due on the salvage, is such a proportion as by the custom or law of a place, is due out of the property saved. And the intention is simply to declare, that in case of loss, the property saved shall be divided according to the law or custom of the country, if there shall be a law or custom prevailing upon the subject.

In this case if the vessel exists in specie, I would not hesitate, upon a proper application, to give the lender the benefit of it, as a part of his security. I entirely concur with Dr. Lushington, "that the general maritime law of the world is directly opposed to the sale of vessels in the manner in which this has been done, and to the consequences attempted to be engrafted upon it." Nor am I disposed to favor this summary proceeding to confer a title against owners, and extinguish all claims and liens which may exist against a vessel. When such consequences are to result, it is proper, if it is practicable, to obtain a decree of a court for the protection of the owner and creditor whose title and lien are sought to be extinguished.